**Robert M. GATCH, Plaintiff–Appellee,**

v.

**MILACRON, INC., Defendant–
Appellant.**

No. 02–3186.

United States Court of Appeals,
Sixth Circuit.

Aug. 31, 2004.

Randolph H. Freking, Megan E. Clark, Freking & Betz, Cincinnati, OH, for Plaintiff–Appellee.

Robert J. Townsend, Roger A. Weber, Taft, Stettinius & Hollister, Cincinnati, OH, for Defendant–Appellant.

Before KENNEDY and GIBBONS, Circuit Judges; and ALDRICH, District Judge.[*]

GIBBONS, Circuit Judge.

Defendant-appellant Milacron, Inc. appeals a district court decision denying its motion for a judgment as a matter of law. On December 12, 1999. plaintiff-appellee Robert M. Gatch filed an action against Milacron, his employer, alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (2000) ("ADEA") and Ohio Rev.Code § 4112.14. A jury found that Milacron had violated the ADEA and awarded Gatch $46,255 in back pay, $193,869 in front pay, and $50,000 in compensatory damages, for a total damages award of $290,124. The jury also found that Milacron had willfully violated the ADEA. Based on this finding, the district court then doubled the jury's back pay award to $92, 510, bringing the total damages to $336,379. Milacron filed a motion for a judgment as a matter of law and an alternative motion for a new trial or to alter or amend the judgment. Both motions were denied. The district court then ordered Milacron to pay Gatch's attorneys' fees and costs in the amount of $100,651.30. Milacron timely appealed. Because we find that Gatch failed to introduce evidence sufficient to support the verdict, we reverse the district court's judgment denying Milacron's motion for a judgment as a matter of law and remand with instructions to enter judgment for Milacron.

I.

Defendant-appellee Milacron, Inc. is a manufacturing company. Its business is divided into two segments: metal cutting and plastics technology. The plastics technology segment is divided into four units: specialty equipment, blow molding, extrusion, and the plastics injection machinery business unit (PIMB). Plaintiff-appellee Robert Gatch worked as Supervisor of Tool Services in the PIMB unit at Milacron. Gatch began working for Milacron in 1957 at age 18. He left the company in 1960 to obtain a bachelor's degree in business administration, after which he returned to Milacron. He left again from 1969 to 1973. Since 1973, Gatch has been continuously employed at Milacron except for one ten month layoff in the 1970s. In 1975, while still working at Milacron, Gatch obtained a masters degree in business administration from Xavier University. He has held a variety of positions at the company, but from the late 1970s to March 1999 he held essentially the same position, Supervisor of Tool Services.

In March 1999, as part of a reduction in force (RIF), the position of Supervisor of Tool Services was eliminated, and Gatch was demoted to an hourly position as an assembler at a lower rate of pay. He was 60 years old at the time of this demotion. The RIF affected 38 positions at the facili-

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

ty where Gatch worked, the Milacron plant in Afton, Ohio. Gatch was the only supervisor affected by the RIF.

Milacron employees are classified into two groups: direct employees and indirect employees. Direct employees are involved in production, and costs associated with them are classified as inventory expenses. Indirect employees are primarily involved in supervision, and costs associated with them are classified as overhead expenses. The RIF plan was initially drafted by James Kinzie, the PIMB plant manager at the Afton plant, and was later reviewed and approved by Dale Werle, General Manager of PIMB's North American operations at the Afton plant and David Palmer, the human resources director of Plastics Technology. Incident to the RIF, Werle instructed Kinzie to reduce the number of both direct and indirect employees.

According to Milacron, the 1999 RIF was precipitated by a drop in sales and profitability by the PIMB division from the last quarter of 1998 to the first quarter of 1999. Milacron pointed to a 30% decrease in North American PIMB sales and an 80% decrease in North American PIMB earnings. Because of this decline, Werle ordered Kinzie to eliminate nine indirect labor jobs and 27 direct labor jobs. Kinzie selected 36 jobs in PIMB for elimination. Two other jobs not in PIMB were also eliminated. Of these 38 employees, 18 (with an average of 36) were laid off, the jobs of four on disability leave were eliminated from the budget, one retired, 12 were transferred to units other than PIMB, and three, including Gatch, were transferred from indirect labor jobs to direct labor jobs within PIMB. The RIF reduced payroll expenses by $1 million. Other cost reductions saved the Afton plant an additional $300,000.

In March 1999, Gatch was responsible for supervising only three employees. All other supervisors responsible for managing employees had at least eight employees reporting to them. Pursuant to the RIF, Gatch's position was eliminated and the three employees formerly supervised by Gatch began to report to Gatch's former immediate supervisor, Steve Dennison, who reported to Kinzie. Milacron asserts that Gatch's former supervisory duties took Dennison less than an hour per day to perform. Gatch's nonsupervisory duties were distributed among the hourly tool room employees. Gatch's job as a supervisor was a salaried position which allowed him to collect additional pay for hours worked in excess of 42.5 per week. Gatch earned approximately $57,000 in 1998 in this position. His new position pays $19.55 per hour, and a higher rate for hours in excess of 40 per week. Prior to 1999, eight PIMB supervisors were transferred to non-supervisory jobs at lower rates of pay when supervisory jobs were eliminated. Milacron's PIMB division performed RIFs in the 1980s, in 1991, 1992, 1996, and 1997, in addition to 1999.

Gatch was the only supervisor demoted or terminated pursuant to the RIF. Kinzie decided which supervisory positions to eliminate. At the time of the RIF, 65–70 indirect employees such as Gatch reported to Kinzie. Gatch was the fourth oldest indirect employee under Kinzie. Twenty-five or twenty-six of the indirect employees reporting to Kinzie were supervisors. According to Palmer, Gatch was one of the oldest and longest serving supervisors at Milacron. Gatch's education level exceeded that of any other supervisor under Kinzie.

Gatch asserts that he was qualified for many other positions within the company at the time of his demotion. One such position which was open at the time was Project Engineer. Gatch claims that he

788

was qualified for this job, as he had performed the same function previously, and had previously supervised Managing Project Engineers. The position was awarded to Michael Barnhart, a salaried supervisor who, like Gatch, reported to Kinzie. At the time of the RIF, Barnhart supervised no employees. He had completed one semester of college. Barnhart lost no salary as a result of his reassignment. Milacron asserts that it transferred Barnhart to the new position on the recommendation of the George Group, an outside consulting firm, which thought the move would increase efficiency.

After the RIF, Milacron hired at least thirty new employees to work in the Plastics Technology Group. All except five of these new employees went to work in the PIMB division. Between February 1999 and April 1999, the time of the RIF, nine indirect employees were hired into the PIMB. However, the parties stipulated prior to trial that "[t]he position of Tool Services Supervisor occupied by Plaintiff was eliminated and Plaintiff was not replaced following the March 1999 reduction in force."

Later in 1999, Milacron offered a voluntary retirement package to workers aged 55 and over who had 15 years seniority.

Gatch's direct supervisor at the time, Dennis Staggs, recommended that Gatch take the offer of early retirement. Gatch testified that he had been subjected to comments regarding his age several times.[1]

Gatch has not received a promotion since his demotion in 1999. He presently works at Milacron as an assembler.

## II.

We review the denial of a Fed.R.Civ.P. 50(b) motion *de novo*, applying the same test as the district court must apply. *Gray v. Toshiba America Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001) (citing *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174–75 (6th Cir. 1996)). A motion for a judgment as a matter of law under Fed.R.Civ.P. 50(b) "may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Id.* (citing *K & T Enters., Inc.*, 97 F.3d at 175–76).

## III.

Age discrimination claims are analyzed under the three-part burden shifting anal-

---

1. The relevant testimony is excerpted here:

Q: Has anyone ever referred to you as Old Man?
A: You hear that phrase every now and then. Someone's always coming down, "Hey, old man. When are you going to leave, take retirement?" So, it's just things you hear on a weekly basis.
Q: Okay. Are these comments directed to you individually?
A: I've had people asked me directly, yes.
Q: Can you recall who has said these things?
A: Well, you have it all the time. But in specifics, they offered an early retirement package late in '99. And my supervisor at that time, Dennis Staggs, approached me and my partner one day just walking down

the aisle and stopped both of us and asked us if we were taking the early retirement package and recommended we both take it and get out because we were both in good health, and get out while the getting is good.
Q: I'm sorry, what was his position?
A: He was supervisor of assembly.
Q: Okay. Anybody else besides Dennis Staggs?
A: People in the shop, all the time. I remember one other supervisor, and that was Lou Voelker, asked me on several occasions, just not about the early retirement but over the years. He and I were approximately the same age and he always was questioning me, "Hey. When are you going to get out of here?"

ysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir.1993). Initially, the plaintiff has the burden of establishing a prima facie case of age discrimination.[2] *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Simpson v. Midland–Ross Corp.* . 823 F.2d 937, 941 (6th Cir.1987). A plaintiff can establish a prima facie case of age discrimination by showing by a preponderance of the evidence that: (1) he was a member of the protected class (age forty to seventy); (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was treated worse than a younger person. *Barnhart*, 12 F.3d at 1390. A plaintiff can also establish the fourth element of the prima facie case of age discrimination by showing "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir.1998) (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990)). Of course, a plaintiff involved in a RIF may still satisfy the fourth element by demonstrating that a similarly situated younger employee received more favorable treatment than the plaintiff during the RIF. *Ercegovich*, 154 F.3d at 350 (citing *Mitchell v. Toledo*

*Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)).[3] To show that another employee is similarly situated, a plaintiff is "required to prove that all of the relevant aspects of his employment situation were nearly identical to those of [the other employee's] situation." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994).

Once a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to provide a legitimate non-discriminatory reason for the action taken. *Ercegovich*, 154 F.3d at 350. If the employer fails to provide such a reason, the court must enter summary judgment for the plaintiff. If the employer does advance a legitimate non-discriminatory reason, the burden shifts back to the plaintiff to show that the employer's proffered reason was a mere pretext for illegal discrimination. *Id.* Throughout the burden shifting analysis, however, the burden of persuasion always remains with the plaintiff. "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

---

**2.** It is important in conducting the burden shifting analysis to focus on the ultimate question of whether illegal discrimination occurred. As this court has stated, "[a]fter a jury verdict, the burden-shifting framework falls away. The question for the court is simply whether there was sufficient evidence to support a finding of age discrimination. However, the elements of that framework remain useful ways of thinking about the evidence and how the jury might reasonably have arrived at its verdict." *Skalka v. Envtl.*

*Restoration Mgmt. Corp.*, 178 F.3d 414, 421 (6th Cir.1999) (citations omitted).

**3.** This younger employee does not have to be from outside the protected class. As the Supreme Court has stated, "[t]he fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out *because of his age.*" *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

■ Here, Gatch failed to present evidence sufficient to find a prima facie case of discrimination. Unquestionably, Gatch is a member of the protected class, suffered an adverse employment action, and was qualified for his former position. Gatch failed, however, to present evidence from which the fourth element of his prima facie case can be found. That is, he failed to present evidence that a similarly situated younger employee received more favorable treatment during the RIF or to present additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.

Gatch seeks to meet the requirements of the fourth element by comparing himself to Michael Barnhart. While Gatch was demoted to an assembly job at a significant reduction in pay pursuant to the RIF, a younger employee, forty-nine year old Michael Barnhart, received a lateral transfer to the position of Project Engineer on April 1, 1999, soon after the March RIF. Gatch put forth evidence that he and Barnhart were similar in several respects. Both were indirect employees. Both had diminishing supervisory roles prior to the demotion and the reassignment. Gatch supervised only four employees, while Barnhart supervised none. Both had worked under the same supervisor, Kinzie, in the Assembly division. Gatch and Barnhart are not similar in all relevant respects, however, because there is no evidence that the RIF affected Barnhart in any way or that Milacron's decisions about Barnhart were a response to the RIF. Instead, the proof is that, in 1998, Milacron hired the George Group, an outside consulting firm, to make recommendations on how Milacron could increase efficiency. Among other things, the George Group recommended that Barnhart, an assembly department supervisor, be reclassified as a project engineer. The George Group observed that Barnhart was presently performing many of the tasks he would be required to perform in the new position, such as reviewing customer orders and working with the sales, engineering, and assembly departments. According to Milacron, Barnhart's new position involved 90–95% of the same duties as his old position. Thus, the only evidence connecting the decision to transfer Barnhart to the RIF is temporal proximity, evidence insufficient to render Gatch and Barnhart similarly situated in all relevant respects.

■ Even if we concluded that Gatch had presented evidence from which a prima facie case could be found, he has failed to present evidence sufficient to establish that Milacron's decision was a pretext for illegal discrimination. In order to show pretext, Gatch is required to show (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate his demotion; or (3) that they were insufficient to motivate his demotion. *Gray v. Toshiba America Consumer Prods., Inc.*, 263 F.3d 595, 600 (6th Cir.2001).

Gatch does not argue that Milacron's proffered reasons were insufficient to motivate the demotion. Indeed, he could not viably make this argument. Milacron presented evidence that the reduction in force was due to cost cutting necessitated by soft performance by the PIMB division. Milacron cites a 30% decrease in North American PIMB sales and an 80% decrease in North American PIMB earnings, which necessitated an overall effort to reduce expenses. As a part of this effort, it eliminated 38 jobs, furloughed all Afton PIMB employees for one week, reduced overtime, travel, marketing, and advertising expenses, cut contract and temporary employees, and cancelled and deferred capital expenses. The testimony was that

Milacron eliminated Gatch's job, tool room supervisor, because the tool room no longer merited its own supervisor. Apparently, the "tool room" was actually part of a larger room with many functions. Therefore, another worker could adequately supervise it without being dedicated to it full time. In addition, the tool room employed only three workers during the time Gatch was on duty (three daytime workers and one nighttime worker) at the time the position was eliminated. This was a substantial decline from the eight employees Gatch supervised when he first became Tool Room Supervisor at Afton.

Rather than focusing on the insufficiency of the reasons, Gatch argues that the evidence was sufficient for the jury to find (1) that the proffered reasons had no basis in fact and (2) that the proffered reasons did not actually motivate the demotion. His argument that the proffered reasons had no basis in fact fails primarily for the same reason that Gatch could not viably argue that Milacron's reasons were insufficient. The evidence about the reasons for the RIF, its effect on employees, and the nature of the tool room supervisor position goes to the factual basis for Milacron's proffered reasons. Further, Gatch fails to offer evidence that Milacron's decision to award the lateral transfer to Barnhart had no basis in fact. Gatch puts forth no evidence that Milacron failed to receive a recommendation from the George Group to move Barnhart.

■ We turn to Gatch's final argument, that the proffered reasons did not actually motivate the demotion. This argument relies on evidence questioning whether a RIF was in fact necessary, a comparison of Gatch's qualifications with those of Barnhart, and other evidence that Gatch asserts permits a finding of age discrimination, including his failure to be promoted back into a supervisory position subsequent to his demotion, the offer of an early retirement program to employees over 55 in late 1999, and age-related comments. Reviewing all of this evidence, we conclude that the evidence does not permit a finding that Milacron's stated reasons were not the real reasons for Gatch's demotion.

As evidence that the 1999 RIF was unnecessary, Gatch points to the fact that Milacron hired several employees soon after the RIF. He argues that Milacron hired at least 30 persons into the plastics technology division between March 1999 and December 1999. He alleges that 25 of these employees were hired into the PIMB. In addition, Gatch points to a press release from Milacron announcing that both sales and earnings per share had increased in the first quarter of 1999 over the first quarter of 1998. The evidence of 1999 hires and the increase in sales and earnings over 1998 hardly undermines Milacron's reliance on the large drop in both PIMB sales and PIMB earnings from the last quarter of 1998 to the first quarter of 1999. Rather, this proof is consistent with Milacron's characterization of the PIMB division as a highly cyclical business. The fairly routine nature of a RIF in response to an economic downturn is highlighted by the fact that Milacron conducted four other RIFs in the 1990s alone. And even if the RIF was not entirely necessary from a business standpoint, it unquestionably occurred, resulting in the elimination of 38 jobs, furloughs, reduction of overtime and other expense reductions. This evidence simply does not permit a finding that age discrimination rather than business judgment motivated the RIF or Gatch's demotion.

With regard to the qualifications of Gatch and Barnhart, although Gatch did have more education, Barnhart had more seniority than Gatch, whose seniority Milacron dated from 1973, when Gatch re-

turned to the company. In addition, while Gatch had done work relating to being a project engineer in the past, his last experience in this area was in 1975. He had no recent knowledge, as Barnhart did, of the assembly processes or products options. As noted, the new position encompassed 90–95% of the functions of Barnhart's prior job. Nothing about the qualifications of the two men suggests that the decision to place Barnhart rather than Gatch into the new position was motivated by age discrimination or anything other than the business justifications offered by Milacron.

Seven months after the RIF, Milacron offered a voluntary retirement package to employees aged 55 and over, with the stated goal of reducing manpower. It was at this time that Dennis Staggs, then Gatch's supervisor, recommended to Gatch and another employee that they should take the early retirement package because they were in "good health" and should "get out while the getting is good."[4] In addition to this comment, Gatch testified that other employees, including one supervisor about his own age, had at other times inquired about when he intended to retire. The offer of the retirement package and these passing comments are insufficient to cast doubt on Milacron's stated reasons for its action.

Finally, we note that, prior to March 1999, the time of the RIF, 64.5% of Afton employees were over 40, and 25.4% were over the age of 50. After the RIF, 66.5% of Afton employees were over 40, and 26.9% were over 50. The average age of Afton employees increased overall from 42.99 to 43.23. Milacron points out that only five of the employees laid off were over 40, and the average age of the employees laid off was 36.16. These statistics argue strongly against the notion that any part of the RIF was motivated by impermissible age discrimination.

## IV.

For these reasons, we find that the district court erred in denying Milacron's motion for judgment as a matter of law. We reverse and remand to the district court for entry of judgment as a matter of law in favor of Milacron.

.     .     .     .     .

ALDRICH, District Judge, Dissenting.

I join the panel's opinion in full with respect to its statement of the facts of this case. Because I believe that the record before the panel does not justify reversal of the jury verdict below, I respectfully dissent.

This is not a case in which the record is replete with evidence supporting the plaintiff's claims, and I join the panel in concluding that Milacron presented substantial evidence supporting its proffered justification for dismissing Gatch. However, this is also not a case in which the record demands a verdict for the defendant. Given time-honored and essential principles of respect for jury verdicts,[1] I

---

4. The dissent states that the jury was entitled to infer discriminatory animus from Staggs's remarks because of the "possibility" that Staggs participated in the decision to demote Gatch. The record contains no evidence whatever that Staggs, who was Gatch's supervisor only after his demotion, played any part in the demotion decision. The dissent would thus permit a jury to infer discriminatory animus based on unfounded speculation.

1. It is axiomatic that a court should tread lightly in reviewing a jury verdict; in discrimination cases, this axiom has given rise to a more specific principle. "[F]ollowing a trial on the merits ... a reviewing court should not focus on the elements of the prima facie case but should assess the ultimate question of discrimination." *Gray v. Toshiba America Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir.2001), *citing Kovacevich v. Kent State Univ.*, 224 F.3d 806, 821 (6th Cir.2000).

would decline to issue a judgment notwithstanding the verdict for Milacron.

Neither the panel nor the parties dispute that Gatch submitted evidence at trial satisfying the first three prongs of the *McDonnell Douglas* test. Regarding the fourth prong, it is clear to me that a reasonable jury could have found that Gatch either demonstrated that a similarly situated, younger employee received more favorable treatment during the RIF or that he presented additional circumstantial evidence indicating that Milacron singled him out for discharge for impermissible reasons. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).

### I. Similarly Situated Persons

In cases such as this one, the parties invariably hold very different impressions as to which employees are "comparable" (or "similarly situated"). Perhaps recognizing this inevitability, this Court has emphasized the flexible nature of its standards for comparability:

> Courts should not [consider the same factors] in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the nonprotected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects.

*Ercegovich*, 154 F.3d at 352 (emphasis in original), citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

Here, Gatch contends that Michael Barnhart—who was concededly younger and better-treated than Gatch—is "similarly situated" for purposes of ADEA review. Both Gatch and Barnhart were indirect employees with substantial seniority, who had seen their supervisory duties diminish over time. Both worked under Jim Kinzie, and both had their former duties "absorbed by others in their areas and by their respective immediate supervisors" in 1999.

The panel adopts the distinction urged by Milacron, between employees demoted pursuant to the 1999 RIF and those, like Barnhart, transferred pursuant to a George Group recommendation. I would hold that this distinction is little more than semantic. Given *Ercegovich*'s exhortation to apply the standard situationally, I would hold that a jury could reasonably find that Gatch and Barnhart were similarly situated. Certainly the district court did not commit reversible error when it concluded:

> Each of these individuals transferred positions within a relatively short period of time of each other. The fact that Defendant wishes to make a subjective dichotomy and declare that Plaintiff was subject to a RIF, whereas Barnhart was simply transferred is not conclusive. The Court accepts the Sixth Circuit's invitation in *Ercegovich* to use common sense in evaluating the choices a company makes in selecting individuals for inclusion in a RIF.

Apx.at 29–30.

### II. Additional Circumstantial Evidence

Showing preferential treatment for similarly situated employees is but one way for a plaintiff to satisfy the fourth prong's requirement of "additional circumstantial evidence." The jury may well have credited other statements made by Gatch, allowing him to complete his *prima facie* case with no reference to Barnhart whatsoever.

The jury might, for example, have reasonably concluded that Gatch presented such evidence simply by demonstrating that he was demoted *in lieu* of being offered the Project Engineer position, for which he was qualified. The jury was entitled to do so without, as Milacron suggests, merely relying on Gatch's "assessment of his own qualifications." Milacron does not dispute that the record in this case contains objective evidence of Gatch's advanced education, or his experience performing tasks similar to those required of a Project Engineer.

For this reason, if not because Gatch successfully demonstrated his similarity to Barnart, the district court was correct in concluding that a reasonable jury could have determined that Gatch established a *prima facie* case of age discrimination.

### III. Milacron's Proffered Explanations/Pretext

The panel concludes that, even if Gatch succeeded in making his *prima facie* case of age discrimination, he could not reasonably be found to have prevailed at the next step in the process, at which he was required to demonstrate that Milacron's proffered reasons for his demotion were merely pretextual. Milacron offered as justification for Gatch's demotion: its desire to cut costs by means of a RIF; the decline in Gatch's supervisory duties and the ability of others to easily absorb his responsibilities; and management's desire to retain Gatch in some capacity (to justify the choice of Assembler for his new position).

To establish pretext, Gatch was required to show that these reasons: (1) had no basis in fact; (2) did not actually motivate the actions taken by Milacron; or (3) were insufficient to motivate Milacron's actions. *Gray*, 263 F.3d at 600, citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). The panel properly focuses on Gatch's arguments regarding method (2)—*i.e.*, that the proffered reasons did not actually motivate the employment action.

In its wording, method (2) appears to require a purely negative showing. *I.e.*, To demonstrate that Milacron's proffered reasons did *not* actually motivate its actions, Gatch might do no more than identify inconsistencies in the testimony of Milacron officials responsible for employment decisions. And there is no question that Gatch accomplished this—the district court devoted the entirety of four pages to listing the inconsistencies uncovered by Gatch's counsel.[2]

Indeed, this Court's prior holdings appear to indicate that the inconsistencies may be enough, despite Milacron's vehement argument that Gatch must supplement them with some "additional evidence." In *Gray*, the Court quoted extensively from *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), in which the Supreme Court noted that, while it does not *compel* judgment for the plaintiff,

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together

---

**2.** *See* Apx. 33–36. Briefly:
- Milacron witnesses, including Kinzie, gave differing accounts of Gatch's eligibility for the Project Engineer position, including whether he was ever considered for it.
- Kinzie refused to classify Gatch's re-assignment as a demotion, and at one point testified

incredibly that he had never heard of the word "demotion."
- Milacron witnesses testified inconsistently regarding hiring decisions made during and after the RIF.

with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that upon such rejection, no additional proof of discrimination is required.

509 U.S. at 511, 113 S.Ct. 2742. Puzzlingly, the Court in *St. Mary's* went on to conclude that, because of the plaintiff's "ultimate burden of persuasion ... it is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* This language led the panel in *Gray,* and the district court here, to require a positive showing in addition to the negative one; *i.e.,* that Gatch needed to submit some "additional evidence" of discrimination beyond the aforementioned inconsistencies.

I would uphold the district court's determination that Gatch presented such evidence, however scant. Gatch introduced negative remarks made by Dennis Staggs concerning his age and lengthy tenure, and testified persuasively as to the hostility of his current work environment. Given the possibility that Staggs participated in the decision to demote Gatch, the jury was entitled to infer discriminatory animus from his remarks. *See Ercegovich,* 154 F.3d at 355 ("Although we believe a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant."), citing *La Pointe v. United Autoworkers Local 600,* 8 F.3d 376, 380 (6th Cir.1993). The jury was also permitted to draw negative inferences from Milacron's failure to call Staggs as a witness, given Staggs' especial availability to Milacron. *U.S. v. Frost,* 914 F.2d 756, 765 (6th Cir.1990).

Given the above, as well as the aforementioned evidence that Gatch was the *only* supervisor demoted during the RIF, the district court was correct to deny Milacron's motion for judgment notwithstanding the verdict. I share the panel's sympathy for Milacron's strong and cogent arguments, but would prefer in this close case to echo the sentiment expressed by the district court:

> The Court has great faith in the jury system and in the capability of jurors to see through the confusion that sometimes results from trials with accusations flowing back and forth ... [J]uries are in a particularly good position to make credibility judgments about witnesses. As such, their verdicts should not be disturbed unless no reasonable juror could conclude otherwise. Defendant has simply failed to make that showing in this case.

Apx. 39; *See also Gray,* footnote 1, *supra.*

## IV. Damages

Having thus ruled in Gatch's favor, I would proceed to the issue of the propriety of the damages awarded, and find that remand is appropriate for a reduction thereof.

The jury awarded a total of $336,379.00 to Gatch, allocated as follows:

$ 46,255   Back Pay
$ 46,255   Liquidated Damages
$193,869   Front Pay
$ 50,000   "Other Damages" [3]

Milcaron claims that these amounts were excessive as a matter of law. In similar ADEA cases, the Sixth Circuit has found excessive damages and remanded to the district court for "determination of an appropriate remittitur and, if necessary, a new trial on damages. *Skalka,* 178 F.3d at

---

**3.** The amount of liquidated damages was equal to the amount of front pay, as provided

429; *Roush v. KFC National Management Co.,* 10 F.3d 392 (6th Cir.1993). Because the district court failed to properly address several troubling irregularities in the jury's award of damages, I would follow the decision to affirm with such a remedy in this case.

### V.   Conclusion

For the reasons stated above, I would depart from the panel's reasoning, and hold that the record does not necessitate the entry of a judgment notwithstanding the verdict in Milacron's favor. Moreover, I would find that the district court did not abuse its discretion in denying Milacron's motion for a new trial. To address irregularities in the award of damages, I would affirm the verdict on liability and remand the case for possible remittitur or a new trial solely on the issue of damages.

for by statute.   [ ] Milacron does not challenge the "other damages" awarded.